FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

DEC 1 0 2008

JAMES N. HATTEN, Clerk
By [signature] Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DYNAMIC DEPTH, INC.,

        Plaintiff,

v.

CAPTARIS, INC.,

        Defendant.

Civil Action File No.
1:07-cv-1488-CAP

## SPECIAL MASTER'S REPORT AND RECOMMENDATION ON CLAIM CONSTRUCTION

This is a patent infringement case in which plaintiff Dynamic Depth, Inc.

alleges infringement of U.S. Patent No. 5,461,488 ('488 Patent) by defendant

Captaris, Inc.  Due to the anticipated complexity in construing the claims, the

Court appointed William F. Smith of Woodcock Washburn LLP as Special Master

to preside over the claim construction hearing and submit to the Court a report and

recommendation on claim construction.

The parties have submitted a First Revised Joint Claim Construction

Statement[1] and briefs[2] on the disputed claim terms.  A hearing was held on October

---

[1] Reference to the statement will be by "JCCS."

[2] Reference to Dynamic Depth's opening and responsive claim construction briefs will be by
way of DDOB and DDRB respectively.  Reference to Captaris' opening and responsive claim
construction briefs will be by way of COB and CRB respectively.

28, 2008, at which no witnesses were called. A copy of the transcript of the hearing is filed with this report.[3]

This is the Special Master's Report and Recommendation on the construction of the disputed claim terms.

## I. Factual and Procedural Background

The Special Master draws the following facts from the documents submitted by the parties, the parties' presentations at the October 28, 2008 hearing, and the specification, drawings and prosecution history of the '488 Patent.

### A. Brief Description of the Technology

The '488 Patent describes a computerized facsimile system and method of operation. The '488 Patent claims data processing systems for processing facsimile transmissions (claims 1-26), methods for routing facsimile transmissions (claims 27-37) and electronic facsimile communicators (claims 38-39). As described in the specification and illustrated in Figs. 1 and 2 of the '488 Patent, upon receipt of a facsimile transmission in a first data format, the present system performs several steps including converting the first data format to a second data format and using the second data format to determine where to route the facsimile data. If the system cannot determine the proper routing of the converted facsimile

---

[3] Citation to the transcript will be by way of "Tr., page:line no.."

data, the converted facsimile data is delivered to a default destination or recipient.

Fig. 1 of the '488 Patent is



## B. Prosecution History of the '488 Patent[4]

The '488 Patent issued October 24, 1995 from Application No. 08/304,337

('337 application) filed on September 12, 1994. The sole inventor of the '488

---

[4] Consideration of the prosecution history of the '488 Patent is based upon the copy provided as DDOB, Exhibits 1-5. Citation to the prosecution history will be by way of "PH, page__" with the page number referring to the electronic numbering appearing at the bottom of the page beginning with "1 (FACE)" and continuing through "83".

Patent is stated to be Keith E. Witek. It is noted that a Keith E. Witek, PTO Registration No. 37,475 is listed as "AGENT OF RECORD" on the "PATENT APPLICATION TRANSMITTAL LETTER" submitted with the '337 application. PH, p. 45. As clarified at the hearing, the named patentee, Keith E. Witek, is the Keith E. Witek who prosecuted the application, i.e., patentee is a registered patent agent. Tr., 34:17-23.

The '337 application was filed with claims 1-39. PH, pp. 30-40. The examiner mailed a first Office Action on the merits (FAOM) on March 7, 1995. PH, pp.46-52. The cover sheet of the FAOM states that claims 1-31 are pending and that claims 1-31 are rejected. PH, p. 46. The examiner made the following rejections in the FAOM:

- Claims 1, 2, 5, 6, 8, and 13-31 under 35 U.S.C. § 102(b) as anticipated by U.S. Patent No. 5,091,790 (Silverberg) or U.S. Patent No. 5,175,684 (Chong) (PH, pp. 47-48)

- Claims 1-31 under 35 U.S.C. § 102(e) as anticipated by U.S. Patent No. 5,247,591 (Baran) or U.S. Patent No. 5,287,199 (Zoccolillo) (PH, pp. 48-49)

- Claims 3, 4, 7 and 9-11 under 35 U.S.C. § 103(a) as unpatentable over Silverberg, Chong, Baran or Zoccolillo in view of "well known prior art" (PH, pp. 49-50)

The examiner did not explain in the FAOM why pending claims 32-39 were not considered.

Applicant responded to the FAOM by way of an amendment and remarks filed in the PTO on June 2, 1995 in which claims 1, 5-7, 9, 10, 14-18, 20, 25-27, 33, 34, and 36-39 were amended. PH, pp. 53-64. In addition, Mr. Witek noted that the FAOM did not acknowledge the presence of claims 32-39. PH, pp. 64-65.

The examiner issued a NOTICE OF ALLOWABILITY on June 23, 1995 that stated claims 1-39 were allowed. PH, p. 70. No explanation was given as to why claims 32-39 were not treated in the FAOM.

## II. DISCUSSION

To borrow a phrase, "the name of the game is the claim." *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir 1998), citing Giles Sutherland Rich, *Extent of Protection and Interpretation of Claims--American Perspectives*, 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990). Claim construction is a matter of law exclusively within the province of the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

The Federal Circuit has "frequently stated that the words of a claim are generally given their ordinary and customary meaning" and "made clear...that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the

invention…." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en

banc) (citations and internal quotations omitted).  To construe a disputed claim

term, the court must start with the intrinsic evidence—the claims, the specification

and the prosecution history.  *Phillips*, 415 F.3d at 1314.  The intrinsic evidence

also includes the abstract of the patent.  *Hill-Rom Co. v. Kinetic Concepts, Inc.*,

209 F.3d 1337, 1341 (Fed. Cir. 2000).  While claims must be read in view of the

patent specification, *Phillips*, 415 F.3d at 1315, "interpreting what is *meant* by a

word *in* a claim 'is not to be confused with adding an extraneous limitation

appearing in the specification, which is improper.'" *In re Cruciferous Sprout*

*Litigation,* 301 F.3d 1343, 1348 (Fed. Cir. 2002) (emphasis in original) (citing

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053, (Fed.Cir.1989)).

The court may also exercise its discretion and consider extrinsic evidence, e.g.,

dictionary definitions, *Phillips*, 415 F.3d at 1319, as long as such sources are not

"used to contradict claim meaning that is unambiguous in light of the intrinsic

evidence." *Phillips*, 415 F.3d at 1324.

### A.  Disputed claim terms

#### 1.  "default computer which is coupled to the control computer" (claims 1 and 16)

Consistent with the definition of "computer" at col. 7, ll. 14-16 of the '488

Patent the parties agree that the word "computer" as used in the disputed term

means a "device… which stores, processes routes, manipulates, or performs like

6

operations on data…." The parties also agree that the word "coupled" as used in the claim phrase means that the default computer and control computer are in communication with each other so that data may be transferred. Thus, the dispute centers on whether the default computer and control computer are "distinct" from each other (Plaintiff, DDOB, pp. 11-14; DDRB, pp. 2-6) or whether the default computer is within the control computer (Defendant, COB, pp. 11-14; CRB, pp. 2-5).

Computer **12** of the '488 Patent is described as:

> FIG. 1 illustrates a computer 12. Computer 12 is also referred to as a control computer and is any device which either manipulates, stores, routes, or transmits data in any manner. In one form, computer 12 can be any computer which comprises one or more of a display screen, a keyboard, a mouse, or a CPU/Memory unit. In other forms, the computer 12 may be a microcontroller, a DSP, a microcontrolling unit, a plurality of microprocessors, a mainframe, a supercomputer, or any like computer device. The computer has either external to it or internal to it access to a memory 13, illustrated in FIG. 1. Memory 13 is comprised of one or more of disk storage, tape storage, magnetic media, non-volatile memory, EPROM memory, EEPROM memory, FLASH memory, DRAM memory, SRAM memory, ROM, CD memory, computer memory, and/or any like memory system or device.

*Id.*, col. 1, l. 67-col.2, l. 15. See also col. 7, ll. 14-16.

"Default computer" is discussed at several places in the '488 Patent as follows:

| Discussion | Citation |
|---|---|
| A ***default computer***, or a default storage location (e.g., disk storage). | Abstract |

| | |
|---|---|
| Route fax to a *default computer*, a printer, and/or a default disk storage area | Fig. 2, **110** |
| In FIG. 1, six possible destinations are illustrated via six computers **26**. In a preferred form, more than one destination is attached to the office network through the E-mail program **20**. It is important to note that any number N of destinations, computers, or users can be coupled to the e-mail code **20** via the office network wherein N is a finite positive integer. In addition, the end user may not always be a computer **26**, but a specific folder, directory, or disk area on a computer, a *default computer*, a disk drive/tape drive, a computer screen, a printer, or the like. | Col. 4, ll. 10-19 |
| In some cases, either the OCR software 16 will not properly convert the pict faxed file 15, or the custom pattern recognition 18 will either not notice a user connected via the office network or not be able to determine a user within the proper error tolerances (see above). In these cases, the fax will either be stored by the control code in a default storage location for access at a subsequent time or will be transmitted via the office network to a *default computer* which can be accessed by a system administrator or secretary who is then responsible for the hand-routing of the faxes which are not properly handled by computer 12. In another form, the fax can simply be printed via a hardware printer 24 and routed by hand via human personnel or stored to a default disk space for access by all users of computers 26. | Col. 4, l. 56-col. 5, l. 3 |

| | |
|---|---|
| If the pattern recognition code 18 cannot find a valid destination via step 108, then the fax is routed to a *default computer*, printed to a printer, and/or stored at a default disk storage area. | Col. 6, ll. 52-55 |

Thus, while the word "computer" as defined in the '488 Patent can be a device that stores data, the '488 Patent uses the term "default computer" as an alternative to phrases such as "default storage location (e.g., disk storage)" and "default disk storage area."

The disputed term appeared in original claim 7 and was added to claims 1 and 16 in the amendment of June 2, 1995. In asserting the claim features of claims 3, 4, 7 and 9-11 would have been obvious in view of "well known prior art," the examiner indicated this feature would have been obvious as it would provide a "default operation for transmission...of data...." PH, pp. 49-50. At the time of the amendment, Mr. Witek is charged with the knowledge that the '488 Patent also described embodiments of the so-called "default operation" as characterized by the examiner other than "default computer," e.g., "default storage location/area" or "default disk space." It may also be the '488 Patent provides written descriptive support under 35 U.S.C. § 112, first paragraph, for generic language such as "default operation" as used by the examiner. However, rather than use any of the other explicitly described embodiments or attempt to establish the original

disclosure implicitly described a generic term, Mr. Witek chose to continue to use the term "default computer."

Defendant's proffered construction is in two parts. The first is that the "default device must be a device that is designated by the system to act as the default device." COB, p. 12. Plaintiff agrees. DDRB, pp. 2-3. The plain meaning of the words "default computer" is that the computer functions as the "default" location of facsimile data for which the data processing system cannot correctly determine the routing. The intrinsic evidence is consistent with the plain meaning of the claim language since the specification makes clear that faxes that cannot be properly routed by the data processing system are subsequently accessed from a "default" location(s). '488 Patent, col. 4, ll. 61-67.

The second part of Defendant's proffered construction of the term, that the default computer not be distinct from the control computer (CCOB, pp. 12-14), is not supported by the intrinsic evidence. As discussed, the '488 Patent consistently uses the term "default computer" as an alternative to other phrases that connote the default location is a portion of a disk, etc. Also the specification of the '488 Patent states the "fax will either be *stored by the control code in a default storage location* for access at a subsequent time *or* will be *transmitted via the office network to a default computer* which can be accessed by a system administrator or secretary who is then responsible for the hand-routing of the faxes which are not

properly handled by computer **12**." *Id.*, col. 4, ll. 61-67. The second option more faithfully tracks the claim language than the first. Thus, the term "default computer" is most reasonably read as being a computer that is distinct from the control computer **12**.

The Special Master concludes that the term "default computer" as it is used in the claim term "default computer which is coupled to the control computer" should be construed to mean a "device which stores, processes routes, manipulates, or performs like operations on data that is distinct from the control computer and is designated for receiving the facsimile data if the data processing system cannot correctly determine where to route the facsimile data."

### 2. "default recipient" (claim 38)

Claim 38 is directed to an "electronic facsimile communicator stored via storage media." The disputed phrase is contained in the following clause:

> a third plurality of binary values for scanning the second data format to determine a recipient of the facsimile transmission out of a plurality of potential recipients in a local area network, if no direct recipient is determined, a ***default recipient*** or a recipient identified by the third plurality of binary values as being the most likely intended recipient of the facsimile transmission is set to be the recipient

The issue as briefed by the parties is whether the "default recipient" is a designated person or location to which a fax is routed if the system cannot identify to whom to communicate the fax (DDOB, pp. 21-22; DDRB, pp. 5-10) or only a designated person (COB, pp. 15-18; CRB, pp. 6-7).

11

In considering this issue, the context of claim 38 as a whole must be kept in mind, i.e., claim 38 is directed to software stored on a storage media. Tr., 28:25-30:5. Thus, claim 38 provides electronic instructions to be executed. The instructions include a third plurality of binary values to determine a recipient out of a plurality of recipients and if no direct recipient is determined, a default recipient or a "most likely intended recipient" is set to be the recipient. In relevant part then, claim 38 recites "default recipient...is set to be the recipient" when a direct recipient is not determined.

The parties proposed constructions are based upon various passages of the '488 Patent that describe a "recipient." For example, the '488 Patent indicates that a "recipient" may be a person or a destination ("[i]n many cases, *one person or one destination will be the recipient of a fax*, but in certain circumstances custom pattern recognition code 18 may find that several or multiple destinations are needed in order to route the fax properly" ('488 Patent, col. 3, ll. 31-35)). However, the '488 Patent also uses the words "recipient" and "destination" in the alternative. See, e.g., '488 Patent, col. 6, ll. 48-52 ("[o]nce step 106 is performed, a step 108 checks the text fax file 17 or FIG. 1 to determine if a valid *recipient or destination or a plurality of valid recipients/destinations* are found from documentation within the fax received by the serial computer interface"). The '488 Patent also uses the word "recipient" in the context of the BACKGROUND

12

OF THE INVENTION section as describing a person. *Id.*, col. 1, ll. 19-29. At the same time the '488 Patent distinguishes between "users" and "destinations," see, e.g. col. 4, ll. 10-19, and defines an exemplary "end-user" as a disk drive (col. 7, ll. 29-30).

The parties proposed constructions do not take into account the context of claim 38 as a whole. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.2d at 1314. Claim 38 is directed to software stored on a storage media. The specific clause of claim 38 under review is directed to a "third plurality of binary values for scanning the second data format to determine a recipient of the facsimile transmission out of a plurality of potential recipients in a local area network." Thus, in the context of claim 38, a "recipient" is most reasonably construed to be binary values stored on the storage media of claim 38 that represent the identity of a "device" in the local area network, not a person.

The parties construction of "default recipient" to mean a person, either in the alternative or solely, is unreasonable in the context of claim 38 as a local area network as referenced in claim 38 does not route facsimiles to persons. Rather, such a network routes facsimiles to devices to which a given person may have access. This is consistent with the intrinsic evidence as the '488 Patent recognizes

the difference between routing facsimiles to persons as opposed to devices at col.

4, l. 56-col. 5, l. 3, which states:

> In some cases, either the OCR software 16 will not properly convert the pict
> faxed file 15, or the custom pattern recognition 18 will either not notice a
> user connected via the office network or not be able to determine a user
> within the proper error tolerances (see above). In these cases, the fax will
> either be *stored by the control code in a default storage location for access*
> at a subsequent time or will be *transmitted via the office network to a
> default computer which can be accessed by a system administrator or
> secretary who is then responsible for the hand-routing of the faxes* which
> are not properly handled by computer 12. In another form, the fax can
> simply be printed via a hardware printer 24 and *routed by hand via human
> personnel* or *stored to a default disk space for access by all users of
> computers 26*.

This portion of the '488 Patent indicates that where a direct recipient cannot be

identified by the software, the software sets the destination of the facsimile as a

device that can be *accessed* by persons who will then take steps, either

electronically or by hand, to deliver the facsimile to the intended recipient.

Thus, when the software of claim 38 is executed on a local area network, the

third plurality of binary values of claim 38 will attempt to determine a recipient out

of a plurality of potential recipients. Failing that, the third plurality of binary

values sets a "default recipient" or a "most likely intended recipient." In this

context, a "recipient" can only be a device on a local area network, not a person.

The Special Master concludes that a "default recipient" in the context of

claim 38 should be construed to mean binary values stored on the storage media

that identify the device to which the electronic software communicator instructs a

14

local area network to route the facsimile transmission when no "direct recipient" is identified.

### 3. "a plurality of computers are coupled to the control computer" (claims 12 and 24)

Claim 12 reads:

> The data processing system of claim 1 wherein a plurality of computers are coupled to the control computer and any one computer in the plurality of computers is a destination computer where the software which uses the second format transmits the facsimile data to the destination computer.

Claim 24 reads:

> The data processing system of claim 16 wherein a plurality of end-user computers are coupled to the control computer where at least one of the end-user computers in the plurality of end-user computers is a destination for the facsimile data.

Plaintiff urges that the term as used in these two claims be construed as "devices, distinct from the control computer, that store, process, route, manipulate, or perform like operations on data and that are communicatively coupled to the control computer." DDOB, pp. 14-16. Defendant urges that no construction of the term is needed and its plain and ordinary meaning applies. COB, pp. 18-19. The dispute then is whether the "plurality of computers" is distinct from the "control computer" to which the plurality is coupled.

Again, the context of the claims as a whole must be considered as only one of the computers set forth in claim 12 is specified as having a function—a

"destination computer" while claim 24 is directed to a plurality of "end-user computers" where any one of the "end-user computers" is designated as a destination for the facsimile data. "Destination computers" are illustrated in Fig. 1 of the '488 Patent and discussed at col. 4, ll. 10-19 as follows:

> In FIG. 1, six possible destinations are illustrated via six computers 26. In a preferred form, more than one destination is attached to the office network through the E-mail program 20. It is important to note that any number N of destinations, computers, or users can be coupled to the e-mail code 20 via the office network wherein N is a finite positive integer. In addition, the end user may not always be a computer 26, but a specific folder, directory, or disk area on a computer, a default computer, a disk drive/tape drive, a computer screen, a printer, or the like.

In this discussion of "destination computers," the '488 Patent distinguishes between "a computer 26 [and] a specific folder, directory, or disk area on a computer, a default computer, a disk drive/tape drive, a computer screen, a printer, or the like." However, the '488 Patent also states the "computers 26 herein may be any type of computer or destination which may not necessarily require display devices, user input devices, or memory. For example, an end-user or destination 26 may simply be a disk drive." *Id.*, col. 7, ll. 26-30. The last sentence equates an "end-user" with a "destination."

The term "default computer" as used in claims 1 and 16 has been construed in Section II. A. 2 above to mean a "device which stores, processes routes, manipulates, or performs like operations on data that is distinct from the control computer and is designated for receiving the facsimile data if the data processing

system cannot correctly determine where to route the facsimile data." A "default computer" according to the '488 Patent can be an "end-user." *Id.*, col. 4, ll. 13-18. To be consistent the "destination computer" of claim 12 and "end-user computer" of claim 24 should be construed in like fashion.

The Special Master concludes that the "any one" of the plurality of computers in claim 12 that is the "destination computer" and the "end-user computers" in claim 24 should be construed as being distinct from the control computer. The other non-destination "computers" of claim 12 that have no stated function may or may not be distinct from the control computer.

    **4. "receiving the facsimile data if the data processing system cannot correctly determine where to route the facsimile data" (claim 1); "receiving the facsimile data if the software cannot correctly determine where to route the facsimile data" (claim 16)**

The disputed phrases appear in the following clauses of claims 1 and 16:

(claim 1) a default computer which is coupled to the control computer for receiving the facsimile data if the data processing system cannot correctly determine where to route the facsimile data

(claim 16) a default computer which is coupled to the control computer for receiving the facsimile data if the software which uses the second format cannot correctly determine where to route the facsimile data in the data processing system

Plaintiff urges that the phrases be construed to mean "receiving data associated with an incoming fax when the system cannot identify to whom to communicate

the incoming fax." DDOB, pp. 16-17; DDRB, pp. 15-17. Defendant urges that no construction is needed. COB, pp. 19-20; CRB, pp. 9-10.

The defendant's position is more reasonable since the phrase "where to route the facsimile data" unambiguously describes the function of the "default computer" in each claim and Plaintiff's proposal in essence changes "where to route" to "to whom to communicate." No basis is seen for so doing.

The Special Master concludes that the plain and ordinary meaning of the questioned phrases applies and no construction is needed.

> **5. "converting a portion of the first data file to a second format" (claim 1); "converting the first data file to a second format" (claim 16); "transforming the first data format to a second data format" (claim 38)**

This issue concerns whether the "first data file/format" should be construed specifically to be a "pict file" as urged by Defendant or more broadly a "file in a non-text format" as urged by Plaintiff. The '488 Patent refers to the "first data file/format" in the main, although not exclusively, as a pict file.[5] For example, the '488 Patent states (col.2, ll. 15-22):

> Within memory 13 is a fax receipt software program 14. Program 14 is generally used to receive data from the serial computer interface and store it into a *pict fax file 15*. The *pict fax file 15* stores information received which is received through the modem 10 and processed by program 14. The information in *fax file 15* is typically one or more fax transmissions or fax documents received through modem 10 via the serial computer interface.

---

[5] A pict file is a graphics file used by MACINTOSH computers. See DDOB, Ex. A.

The Abstract of the '488 Patent states:

> Once the fax is received by the computer (12), a program (14) stores the fax in a computer file (15) in a ***non-text format***.  Code (18) [sic (16)], converts the ***non-text format*** of file (15) to a text format (17) which is read by a pattern recognition program (18).

The '488 Patent also describes this aspect of the invention in terms that

indicate the broader term "data format" is a pict file at col. 2, ll. 36-40, stating:

> Also, the fax receipt software 14 is coded to dynamically and automatically match the transmission speed of the data coming in through the modem 10. The fax receipt software program 14 has the primary purpose of receiving one or more fax transmissions through the modem 10 and ***processing that fax transmission into a data format stored in the pict fax file 15***, which can be subsequently processed.

Plaintiff takes note that three of the four allegedly anticipating references

applied by the examiner in the FAOM do not describe a pict file but rather, the

examiner implicitly asserted the "raw image facsimile file" of Zoccolillo, the "full

bit mapped image" of Baran and the "images corresponding to fax messages" of

Silverberg as being within the scope of "first data file/format."  DDOR, pp. 20-21.

Defendant counters that the drafter of the '488 Patent was well aware of how to

provide an expansive definition for a patent term, pointing to col. 7, ll. 19-24 of the

'488 Patent.  COB, pp. 22-23.  It is also noted that the '488 Patent provides

expansive definitions for other terms at col. 2, ll. 3-14 and 25-33 and col. 4, ll. 14-

18.

In considering the issue of construing claims in light of the specification as opposed to importing limitations into the claims the Federal Circuit has emphasized the focus should be on understanding how a person of ordinary skill in the art would understand claim terms. *Phillips,* 415 F.3d at 1323. The Federal Circuit has also "rejected the contention that if a patent describes only a single embodiment, the claims must be construed as being limited to that embodiment." *Phillips,* 415 F.3d at 1323 (citation omitted) but in so doing also stated it must be determined "whether the patentee is setting out specific examples of the invention to accomplish [stated] goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.*

There have been circumstances where the Federal Circuit has found it appropriate to construe a broad claim limitation as limited to a disclosed embodiment, CRB, pp. 10-13, which determination is based upon the facts of a given case. *Wang Labs., Inc. v. Am. Online, Inc.,* 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("Although precedent offers assorted quotations in support of differing conclusions concerning the scope of the specification, these cases must be viewed in the factual context in which they arose. Whether an invention is fairly claimed more broadly than the 'preferred embodiment' in the specification is a question specific to the content of the specification, the context in which the embodiment is described, the prosecution history, and if appropriate the prior art . . . ."). Of the

cases cited by defendant, *Honeywell Int'l, Inc. v. ITT Indu., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) is instructive.

In *Honeywell*, the broad claim term under review was "fuel injection system component." In holding that term should be construed to mean "fuel filter," the court looked to such factors as the patent describing a fuel filter as the "invention" and that a fuel filter was the only fuel injection system component described in the patent that contained the inventive feature. *Honeywell*, 452 F.3d at 1318. Here, while the majority of the specification of the '488 Patent resides under the heading "DESCRIPTION OF A PREFERRED EMBODIMENT," the specification does describe the use of a pict file as part of the present invention. This is seen in the BRIEF DESRIPTION OF DRAWINGS section (col. 1, ll. 33-37) that states:

> FIG. 1 illustrates, in a block diagram, a fax data processing system *in accordance with the present invention*; and
> FIG. 2 illustrates, in a flowchart, a method for performing computerized routing and tracking of fax documents *in accordance with the present invention*.

Each of Figs. 1 and 2 uses the term "pict file" in depicting the first data file/format.

While the claims and specification do use broad language such as "first data format" and "first data file," it cannot be gainsaid that the only embodiment described in the '488 Patent of such generic terms is a pict file. To the extent the prior art describes non-text formats useful in facsimile systems other than a pict file as argued by Plaintiff, the fact remains the '488 Patent did not incorporate such prior art knowledge in the written description and drawings. Rather, as noted the

'488 Patent describes a pict file as the single embodiment of a "first data file/format," e.g., the '488 Patent states the software program **14** processes the fax transmission into a "data format" that is "stored in the pict fax file **15**." It is again noted that the '488 Patent provides expansive definitions for many of the claim terms but not for these two terms. The content of the prior art and, thus, the knowledge of a person of ordinary skill in the art, hurts Plaintiff's position rather than supports it. A person of ordinary skill in the art in trying to understand the scope of the questioned terms would read the '488 Patent as a whole as well as the prosecution history. In so doing that hypothetical person, while understanding Plaintiff's argument that there were alternative embodiments to pict file in the prior art at the time the '488 Patent was drafted, would determine the '488 Patent eschewed disclosure and reliance upon any other prior art embodiments. Given the lack of disclosure and reliance upon possible alternative embodiments in the '488 Patent, the person having ordinary skill in the art would reasonably conclude that the questioned terms mean a pict file.

No significant weight is given to the examiner's apparent broad reading of the claim terms in inferring the formats described in Zoccolillo, Baran and Silverberg met this claim requirement in the anticipation rejections as the claim construction standard used by the USPTO in regard to pending patent claims differs from the claim construction used by courts in construing issued patent

claims. *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997) ("It would be inconsistent with the role assigned to the PTO in issuing a patent to require it to interpret claims in the same manner as judges who, post-issuance, operate under the assumption the patent is valid.").

The Special Master concludes that the terms "first data format" and "first data file" should be construed to mean a "pict file."

### 6. "electronically routing the facsimile transmission to a recipient chosen from a plurality of potential recipients by the scanning performed by the third plurality of binary values" (claim 38)

This phrase appears in the following clause of claim 38 of the '488 Patent:

> a fourth plurality of binary values for electronically routing the facsimile transmission to a recipient chosen from the plurality of potential recipients by the scanning performed by the third plurality of binary values

Plaintiff urges that the phrase be construed as "communication of the fax to a recipient chosen by software that scans the second format and determines the appropriate recipient" and that a recipient of a fax according to the '488 Patent may be a person or location and that the phrase "electronically routing" is an "active term, which requires that the fax be routed electronically to the recipient (as opposed, for example, to being hand carried.)" DDOB, p. 22-23.  Defendant urges that no construction is needed.  COB, pp. 23-24.

Claim 38 is directed to an "electronic facsimile communicator stored via storage media."  "Default recipient" as the term is used in claim 38 has been

construed in Section II. A. 2 above to mean "binary values stored on the storage media that identify the device to which the electronic software communicator instructs the local area network to route the facsimile transmission when no 'direct recipient' is identified." In support of that construction, it was determined that in the context of claim 38 a "recipient" is a device on a local area network, not a person. Thus, reading claim 38 as a whole, the fourth plurality of binary values function to "electronically route" the facsimile transmission to a device on a local area network chosen by the third plurality of binary values.

The Special Master concludes that the fourth plurality of binary values of claim 38 should be construed to mean "electronically routing the facsimile transmission to a device on a local area network chosen from a plurality of potential devices on the local area network by the scanning performed by the third plurality of binary values."

## III. Conclusion

For the foregoing reasons, the following terms of the "488 Patent claims are construed as follows:

| Claim term | Construction |
|---|---|
| "default computer" | device which stores, processes routes, manipulates, or performs like operations on data that is distinct from the control computer and is designated for receiving the facsimile data if the data processing system cannot correctly determine where to route the facsimile data |
| "default recipient" | binary values stored on the storage media that identify the device to which the electronic software communicator instructs a local area network to route the facsimile transmission when no "direct recipient" is identified |
| "a plurality of computers are coupled to the control computer" | "any one" of the plurality of computers in claim 12 that is the "destination computer" and the "end-user computers" in claim 24 are distinct from the control computer.  The other non-destination "computers" of claim 12 that have no stated function may or may not be distinct from the control computer |
| "receiving the facsimile data if the data processing system cannot correctly determine where to route the facsimile data" (claim 1); "receiving the facsimile data if the software cannot correctly determine where to route the facsimile data" (claim 16) | the plain and ordinary meaning of the questioned phrases applies and no construction is needed |
| "converting a portion of the first data file to a second format" (claim 1); "converting the first data file to a second format" (claim 16); transforming the first data format to a second data format" (claim 38) | "first data format" and "first data file" are a "pict file" |
| "electronically routing the facsimile transmission to a recipient chosen from a plurality of potential recipients by the | "electronically routing the facsimile transmission to a device on a local area network chosen from a plurality of |

| | |
|---|---|
| scanning performed by the third plurality of binary values" | potential devices on the local area network by the scanning performed by the third plurality of binary values." |

Dated:  December 10, 2008

William F. Smith
Woodcock Washburn LLP
1180 Peachtree St., NE, Suite 1800
Atlanta GA 30309
404 459 0050

## Certificate of Service

I hereby certify that on this 10th day of December 2008, a copy of the SPECIAL MASTER'S REPORT AND RECOMMENDATION ON CLAIM CONSTRUCTION was filed with the Clerk of Court by courier and a copy thereof was sent by a commercial overnight service to:

Counsel for Plaintiff:

Dan R. Gresham
THOMAS, KAYDEN, HORSTEMAYER & RISLEY, L.L.P.
600 Galleria Parkway, Suite 1500
Atlanta GA 30339

Counsel for Defendant:

Ramsey M. Al-Salam
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle WA 98101

William F. Smith

27